**SIGNED THIS: July 25, 2011**

_____
**THOMAS L. PERKINS
UNITED STATES CHIEF BANKRUPTCY JUDGE**

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| DAVID A. MOFFETT, | ) | No.  10-81555 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| STATE BANK OF INDUSTRY, an Illinois Banking Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 10-8093 |
| | ) | |
| DAVID A. MOFFETT, | ) | |
| | ) | |
| Defendant. | ) | |

### O P I N I O N

This matter came before the Court for trial on the amended complaint filed by State Bank of Industry (STATE BANK) to determine the dischargeability of a debt owed by David Moffett, the Debtor (DEBTOR), pursuant to sections 523(a)(2)(A) and (a)(2)(B).

STATE BANK is a small bank that operates at a single location in a community of approximately 500 residents. The DEBTOR, involved in the business of buying and selling antiques, had maintained accounts at STATE BANK for many years. The DEBTOR owned two buildings in Industry, both of which were less than half a block from STATE BANK.[1] Those buildings housed both his residence and his workshop, where he refurbished antiques prior to their resale. The DEBTOR would frequently attend fairs, flea markets and antique shows on weekends.

Shortly after Ralph Slaughter became President of STATE BANK in the early spring of 2000, he made the DEBTOR'S acquaintance and the two became friends. They would often meet on Monday mornings and the DEBTOR would apprise Slaughter of the weekend's results. Slaughter was a regular visitor to the DEBTOR'S workshop and had even purchased an item for a family member. Though he did not know her well, Slaughter was also acquainted with the DEBTOR'S mother, Ardelle M. Moffett, and knew that she attended weekly shows with him.

In and after 2000, the DEBTOR'S banking transactions were almost exclusively through Slaughter. At the time Slaughter joined STATE BANK, the DEBTOR had been a customer for a number of years and had existing loans with the bank. Several of the DEBTOR'S notes were renewed when he was unable to pay the full amount as they came due, with Slaughter requiring only that the interest due be paid. The DEBTOR signed a commercial security agreement on December 20, 2006, granting STATE BANK a blanket security interest in accounts, inventory, equipment and general intangibles, to secure a

---

[1] The address of STATE BANK is 101 W. Main Street and the addresses of the DEBTOR'S properties are 103 and 105 E. Main Street, in Industry.

single loan made on that same date for $1,728.03. A second security agreement covering the same collateral was signed on July 17, 2007, which secured all present and future debts. Both agreements state that the collateral was business property. STATE BANK also held a security interest in the DEBTOR'S 1978 pickup truck. During this period, the DEBTOR had tendered three or four statements which showed his net worth, two of which ranged from $700,000 to $1,000,000. Slaughter completely disregarded those statements, considering them to be fanciful based on the DEBTOR'S inclusion of amounts that he expected to inherit upon his mother's death.

The DEBTOR reported to Slaughter that, reflective of the general economy, the antique business encountered a slump during 2008. In January, 2009, Slaughter requested that the DEBTOR prepare a list of the antiques that he owned, showing both a fair market value and a fire sale value.[2] The DEBTOR prepared and gave to Slaughter a list six pages long, listing 125 items or categories of antiques and 3 pieces of equipment. The DEBTOR estimated the fair market value of the property to be $52,975 and the "depressed market" value to have a value range of $27,200 to $36,870. The list is signed by the DEBTOR. The sixth page of the list contains handwritten notes made by Slaughter indicating that the DEBTOR owed STATE BANK $28,468.77 as of February 26, 2009, that the loan to retail value of the property was 53.74%, the loan to wholesale value was 77.21%, and the loan to fire sale value was 104.66%. The DEBTOR testified that he prepared the list for insurance purposes, not for the purpose of STATE BANK to evaluate its collateral position, and that he gave the list to Slaughter to put in his safe deposit box. The Court credits Slaughter's version and discredits the DEBTOR'S version.

---

[2]Slaughter recollected that an inventory list had been provided by the DEBTOR in 2001, but it no longer remained in the bank files.

3

The DEBTOR'S financial struggles continued through the following year. As of May, 2009, the DEBTOR was indebted on the following notes:

| DATE | NUMBER | AMOUNT | PURPOSE |
|---|---|---|---|
| 07-17-2008 | 60903 | $10,043.21 | Renewal of note #59814 |
| 08-19-2008 | 61009 | 1,668.07 | Renewal of note #60904 |
| 10-21-2008 | 61188 | 4,658.45 | Renewal of note #61009 & advance additional funds |
| 11-05-2008 | 61234 | 8,747.32 | Renewal of note |
| 01-06-2009 | 61401 | 3,537.07 | Overdrawn checking account |
| 04-06-2009 | 61703 | 1,779.65 | Extension of note #60409 |

In early 2010, STATE BANK sued the DEBTOR in state court. A judgment was entered by default in favor of STATE BANK on May 6, 2010, in the amount of $34,422.93, plus attorney fees of $11,500, and a memorandum of judgment was recorded on May 12, 2010. The DEBTOR filed a Chapter 13 petition on that same day.[3]

The DEBTOR, single with no dependents, lists his occupation on Schedule I as an "employee" of "Moffett Antiques" for 28 years, with the address for his employer at 821 E. Washington St., Macomb, Illinois, the residential address of Ardelle M. Moffett. In his Statement of Financial Affairs (SOFA), the DEBTOR lists total income for 2008 and 2009 to be $13,000 for each year, and the source of the income as "Moffett's Antiques." On Schedule I, he lists his monthly gross income as $1,083.33. Both declarations of income equate to $250 per week.

On the lines on Schedule B requiring disclosure of certain personal property including antiques and, separately, machinery and equipment, the DEBTOR checked the "None" column. In paragraph 10 of his SOFA, requiring disclosure of certain prepetition

---

[3] The memorandum of judgment was recorded on May 12, 2010, at 9:53 a.m. The bankruptcy petition was filed later that day at 4:32 p.m.

4

transfers, the DEBTOR asserts that between January 15, 2010 and February 15, 2010, he transferred to his mother, Ardelle, antiques having a value of $3,395. At trial, he testified that he sold all of the antiques and equipment listed on the January 6, 2009 property list, to his mother, for one-fourth of their depressed sale value, and that most of the items were later resold by Ardelle.[4] The DEBTOR scheduled household goods having a value of $1,050. The DEBTOR scheduled STATE BANK as holding a claim of $45,922, secured only by his 1978 pickup truck and a 1968 Ford Mustang missing an engine, having a combined value of $700.

The DEBTOR'S plan, proposing monthly payments of $214 for a period of six months and $257 per month for a period of fifty-four months, was confirmed by the Court. The plan provides for STATE BANK to be paid $8,433 on its claim secured by its judgment lien on the DEBTOR'S property at 103 E. Main, and $500 on its claim secured by DEBTOR'S pickup. The judgment lien against the DEBTOR'S residence at 105 E. Main St. was avoided.

STATE BANK brought this adversary proceeding, seeking a determination that its debt is nondischargeable under sections 523(a)(2)(A) and (a)(2)(B). A trial was held on April 15, 2011. The only witnesses to testify were Slaughter and the DEBTOR.[5] Slaughter, who had retired before the trial after nearly 50 years in banking, testified that he left STATE BANK in October, 2010, after temporarily serving as Vice President since his replacement as President was hired in May, 2009. According to Slaughter's testimony, the DEBTOR would often wait for him on Monday mornings and the two would discuss the results of

---

[4]There is no indication in the record that STATE BANK ever attempted to obtain possession or foreclose its security interest in its collateral as against the DEBTOR or against Ardelle. STATE BANK did not assert a nondischargeability claim for willful and malicious injury to property interest against the DEBTOR under section 523(a)(6) for unauthorized and wrongful disposition of its collateral. The issue of the validity or enforceability of the security interest is not before the Court.

[5]The DEBTOR'S mother did not testify at trial. No explanation was offered for her absence.

the weekend's sales. The DEBTOR would describe the items that were acquired during the weekend auctions, and advise Slaughter of the anticipated profit on resale. Often Slaughter would accompany the DEBTOR back to his workshop to view the new items. Similarly, when the DEBTOR was loading up the trailer at the end of the week to travel to the auctions, Slaughter would walk over to visit with him about his plans for the upcoming weekend. These twice-weekly visits continued regularly throughout Slaughter's ten years with the bank. From all indications, Slaughter believed that the DEBTOR was in the business of buying and selling antiques and he never indicated to Slaughter that he was only an employee of his mother.

Slaughter testified that the bank would cover the DEBTOR'S checks when his account was overdrawn and, on at least two occasions, the DEBTOR signed a note for the funds which had been advanced. The monthly checking account statements for January, 2008, through September, 2008, and for November, 2008, are part of the record. For those ten months, the account was often in a negative balance status. STATE BANK charged the DEBTOR an overdraft fee of $15 on 123 occasions totaling $1,845 in overdraft charges. The loans included additional funds to cover his expenses until additional deposits were to be made.

Nearly all of the loan or interest payments made by the DEBTOR were in cash and were most often made to Slaughter, personally. Over the years, the DEBTOR had executed a number of security agreements granting STATE BANK a security interest in "inventory." It was Slaughter's understanding that the DEBTOR, in executing the security agreements, was granting STATE BANK a security interest in the inventory of antiques that Slaughter

6

would see from time to time in the DEBTOR'S workshop and in his residence. Slaughter testified that he relied on the DEBTOR'S representations regarding the collateral in making the loans and that he trusted the DEBTOR completely. When business suffered, the DEBTOR would be concerned that STATE BANK would be undercollateralized. Slaughter recalled that the DEBTOR made at least one offer to grant STATE BANK a mortgage on his real estate to secure his outstanding loans. Because Slaughter had faith in the DEBTOR and confidence in his restorative skills, he did not take the DEBTOR up on his offer. Slaughter recalled that the DEBTOR'S checking account was held in his name alone and that he later added his mother's name to the account, a change which he did not regard as particularly relevant. Slaughter testified that although the DEBTOR'S mother was on the checking account, he never recalled her writing a check or ever seeing her come to the bank.[6]

Slaughter admitted that STATE BANK did not always follow standard lending practices in the banking industry. Slaughter explained that the bank knew its customers and that in making a new loan the bank would review the customer's history. If a customer had a good payment history, no credit bureau report would be obtained. If a customer furnished a net worth statement, it would be relied on by the bank with no further inquiry. Loans made during the prior month were reviewed by the Board of Directors at its monthly meetings. According to Slaughter, the pattern of payments made by the DEBTOR changed significantly in 2008. Although Slaughter characterized the DEBTOR'S financial standing in that year as being very poor, he continued to renew his loans. At that point, Slaughter chose to work with the DEBTOR through the hard times,

---

[6] Ardelle resided in Macomb, which is approximately 10 miles from Industry, as the crow flies.

7

based in his faith in the DEBTOR'S skills, rather than shut the DEBTOR down.

Slaughter testified that after the loan was made to the DEBTOR in January, 2009, for $3,507.39, to cover the bad checks written by the DEBTOR, he requested that the DEBTOR furnish an itemization of STATE BANK'S collateral, with a listing of realistic values in a depressed market. When the DEBTOR returned in the afternoon, Slaughter went over the list with the DEBTOR, suggesting that he sell some of the items to reduce the amount of the indebtedness. At a later point, Slaughter totaled up the values, concluding that the bank was probably fully secured. Slaughter testified that the DEBTOR had furnished at least one other listing of collateral, in his early years at the bank, which had likely been shredded in a purging of older loan files.

The DEBTOR, age fifty-eight at the time of trial, testified that he has always worked for his mother. He denied that he buys and sells antiques on his own behalf. According to the DEBTOR, the antiques that he owned were not held for sale or trade, were not business inventory, but were merely his personal property acquired through purchase or by gift. The DEBTOR testified that his mother pays him wages of $250 each week in cash and that she has done so for over twenty years. He testified that he did not understand the terms of the commercial security agreements, had not read them, but signed all of the documents that were placed before him, simply because he was friends with and trusted Slaughter. According to his testimony, he was unaware that the purpose of the documents was to grant STATE BANK a security interest in property in which he had an ownership interest. It was his belief that the numerous loans were unsecured. He testified that he prepared the January, 2009, list of property, for purposes of obtaining insurance, but he did

8

not have the funds to purchase it. The list was given to Slaughter in order that it could be put in the DEBTOR'S safe deposit box. At the time he prepared the itemization, he owned all of the items listed, including the blue diamond ring valued at $24,000. He testified that he later sold all of the items to his mother. At the time of trial, all of those items, with the exception of the ring, had been sold in the regular course of his mother's business. He testified that he had told Slaughter "many, many" times that it was his mother's antique business. He admitted that he had offered his real estate as collateral for the loans.

At the close of the evidence, the DEBTOR moved for a directed verdict on both claims under section 523(a)(2)(A), for general fraud and (a)(2)(B), for a false financial statement. The Court referred to its prior decision in *In re Cassel*, 322 B.R. 363 (Bankr.C.D. Ill. 2005), in which it narrowly interpreted the section 523(a)(2)(B) exception for statements respecting the debtor's financial condition, limiting such statements to financial-type statements, such as balance sheets, income statements or similar documents from which an entity's overall financial picture may be ascertained. Ruling that the list submitted by the DEBTOR to STATE BANK fell short of that type of document, the Court granted motion for directed verdict in the DEBTOR'S favor on the section 523(a)(2)(B) claim. A contrary ruling was made by the Court on the claim brought under section 523(a)(2)(A). The Court, viewing the evidence in the light most favorable to STATE BANK, determined that the evidence was such that a trier of fact could find that the DEBTOR committed a fraud against the bank. In so ruling, the Court noted the Seventh Circuit's ruling in *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000), and its broad definition of "fraud" as including any intentional deception or trick. The Court afforded both parties an

opportunity to file briefs.

**ANALYSIS**

STATE BANK'S remaining claim seeks a determination that the debt owed by the DEBTOR is nondischargeable pursuant to section 523(a)(2)(A). Under section 523(a), the party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Matter of Scarlata*, 979 F.2d 521 (7th Cir. 1992). That burden of proof must be met by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). In order to further the policy of providing the debtor with a "fresh start," exceptions to discharge are to be construed strictly against the creditor and liberally in favor of the debtor. *Meyer v. Rigdon*, 36 F.3d 1375 (7th Cir. 1994).

Section 523(a)(2)(A) sets forth three types of misconduct which will give rise to a nondischargeable debt. That section provides that a debtor shall not be discharged from a debt to the extent that it is obtained by:

> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A). "False representation" refers to express misrepresentations, either oral or written. *In re Bowden*, 326 B.R. 62 (Bankr.E.D.Va. 2005). In contrast, "false pretenses" references implied misrepresentations or any conduct intended to create and foster a false impression. *In re August*, 448 B.R. 331, 349 (Bankr.E.D.Pa. 2011). False pretenses has been defined as:

> [A] series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully

> induced by the debtor to transfer property or extend credit to the debtor....
> A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

*In re Hanson*, 432 B.R. 758 (Bankr.N.D.Ill. 2010)(quoting *In re Paneras*, 195 B.R. 395, 406 (Bankr.N.D.Ill. 1996). A cause of action predicated upon false pretenses, rather than an affirmative misrepresentation, nevertheless requires the plaintiff to prove justifiable reliance and causation of loss. *Hanson*, 432 B.R. at 773; *In re Ali,* 321 B.R. 685, 690 (Bankr.W.D.Pa. 2005). Justifiable reliance is an intermediate level of reliance. It is less than reasonable reliance, but more than mere reliance in fact. *Field v. Mans,* 516 U.S. 59, 74-75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases. *Id.* at 71.

Actual fraud incorporates the traditional elements of fraud as known at common law, and is a generic concept that encompasses "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *McClellan*, 217 F.3d at 893. In order to establish that a debt was incurred by actual fraud, the creditor must show that (1) a fraud occurred, (2) the debtor intended to defraud the creditor, and (3) the fraud created the debt. *Hanson*, 432 B.R. at 772. Despite these semantic distinctions, a particular scenario may constitute both "actual fraud" as well as "false pretenses." *See In re Gilmore*, 221 B.R. 864 (Bankr.N.D.Ala. 1998).

This is not a case of a written or oral false representation. Neither does it involve

11

a premeditated scheme of fraud. It is best characterized as a false pretenses case. Whether the allegations fit best within the exception for false pretenses or for actual fraud, essential to both is proof that the debtor acted with the intent to deceive. *In re Howard*, 339 B.R. 913 (Bankr.N.D.Ill. 2006). Because direct evidence of an intent to deceive is rarely available, fraudulent intent may be established by circumstantial evidence or by inferences drawn from a course of conduct. *In re Logan*, 327 B.R. 907 (Bankr.N.D.Ill. 2005). The alleged deceptions perpetrated by the DEBTOR fall into two factual categories. First, Slaughter believed the DEBTOR owned and operated the antique business enterprise as his own sole proprietorship and was shocked to learn that he was merely an employee of the business owned and operated by his mother, Ardelle. Second, Slaughter believed that the DEBTOR personally owned all of the antiques acquired by or used in the business, that STATE BANK acquired a valid security interest in all of the antiques, and he was shocked to learn the DEBTOR actually claimed ownership of only some antiques, none of which were assets of the business.

So STATE BANK'S claim requires proof that the DEBTOR, with an intent to deceive, acted to create the appearance to Slaughter that the antique business was owned and operated by the DEBTOR, and that all of the antiques in his shop were owned by him as assets of the business. The claim also requires proof that Slaughter actually and justifiably relied on the false appearances and that but for those appearances and his reliance thereon, loans would not have been made or renewed. No evidence was introduced at trial that the DEBTOR ever made an affirmative representation to Slaughter of either fact. Nor was there any evidence that Slaughter ever directly asked the DEBTOR to confirm that he

owned the business. Slaughter did ask the DEBTOR to list the antique inventory resulting in the January 6, 2009, list of antiques and equipment and their values. Slaughter, however, never questioned or challenged the list as incomplete or inaccurate; he accepted it at face value.

A word here about the credibility of the witnesses. Slaughter impressed the Court as scrupulously honest. Although his recollection was generally good, he went out of his way to clarify when he was not absolutely sure of the accuracy of an answer. He answered the questions directly, without embellishment, going out of his way not to gratuitously impugn the DEBTOR'S character. The DEBTOR, not nearly as forthright, generally expressed a poorer recollection and an eagerness to volunteer self-serving statements. The DEBTOR displayed an unusual, somewhat off-putting personality, that might be described as an air of detachment or indifference, coupled with an ability to describe suspicious events in a flat, matter-of-fact manner. Nevertheless, the Court perceived his disposition as genuine and not contrived.

After carefully considering the evidence and evaluating the testimony, the Court is not persuaded that STATE BANK sustained its burden of proving that the DEBTOR acted with the intent to defraud. This is a close issue, as there is evidence in the record from which an intent to deceive could be inferred, but there is no smoking gun. Although "false pretenses" perhaps encompasses a less overt form of deception than a false statement or an intricate scheme to defraud, it is doubtful that a false pretenses claim could be established without proof of some positive acts by the debtor in furtherance of the deception. Proof of such acts by the DEBTOR is absent. STATE BANK'S case relies largely

on the DEBTOR'S inaction – his failure to tell Slaughter his true status with the business, despite never being asked about it directly.

The long-standing friendship between Slaughter and the DEBTOR is entirely inconsistent with an intent to deceive on the part of the DEBTOR. Had the DEBTOR been intent upon hiding his lack of ownership interest in the antique business from STATE BANK, it is not likely he would have maintained such an open and candid relationship with Slaughter.[7] The list of items which was furnished to Slaughter in January, 2009, were in fact all owned by the DEBTOR at that time. STATE BANK does not contend that the list was incomplete or that it included items owned by someone else at that time. Despite the DEBTOR'S fabrication at trial about its purpose, the accuracy of the list cuts against an inference of intent to deceive.[8]

The Court did not perceive the DEBTOR as a particularly cunning individual. Rather, he appeared to be an unpretentious and simple person. Moreover, the DEBTOR'S voluntary offer of granting STATE BANK a mortgage on his real estate as additional collateral for the loans is inconsistent with an intent to defraud. Finally, the DEBTOR regularly paid the interest on the loans and never, apparently, had the resources to pay them off. This history is consistent with an intent to deal honestly with his obligations on

---

[7]The DEBTOR may have enjoyed the increased stature that he gained in Slaughter's eyes from being viewed as the owner of the antique business (a point he was not asked about). Even if so, there is no evidence that necessarily supports an intent to deceive in order to obtain loans or renewals. If the DEBTOR was puffing his status, it is as likely as not that he was doing so simply as a way to enhance his personal relationship with the president of the local bank, not for the purpose of obtaining additional credit.

[8]The DEBTOR'S alleged sale of all of the antiques and equipment to Ardelle did not occur until 2010, well after the last of the loans and renewals. While the transfer may well have been fraudulent as to STATE BANK, evidence of a fraudulent state of mind in 2010 does not relate back to prior periods. If, in fact, there is a problem with the validity of STATE BANK'S security interest because of the collateral description, there is no evidence whatsoever that the DEBTOR had any understanding of Article 9 law. Any suggestion that the DEBTOR intentionally created false pretenses so as to defeat or set up defenses to the security interest is wholly without merit.

the loans. Based on all of the evidence, the Court concludes that STATE BANK failed to prove by a preponderance of the evidence that the DEBTOR acted with an intent to deceive or defraud STATE BANK in order to obtain loans or renewals.

Turning to the reliance issue, the Court concludes that while Slaughter was mistaken in fact and relied upon his belief that the DEBTOR owned the business and all the antiques, his reliance was not justifiable. Though it is clear from the evidence that the relationship between Slaughter and the DEBTOR was more than that of a lender and a borrower, the trust placed by a bank officer in the bank's customers can only go so far. A bank or other commercial lending institution, unlike one who is less financially astute, cannot claim to be naive and easily tricked. Ordinarily, it is only where a commercial lender adheres to prudent lending procedures, but is nonetheless duped, that it is entitled to a remedy. In this Court's view, Slaughter, was unquestionably remiss. While acknowledging that STATE BANK did not follow standard lending practices in the banking industry, Slaughter testified that the loan approval process he employed with respect to the DEBTOR'S loans complied with the bank's usual procedures for its long-time (*viz.* trustworthy) customers. When the notes were renewed, Slaughter did not require the DEBTOR to fill out a loan application or to provide a personal financial statement or any other additional information. Slaughter basically relied upon his instincts.

Slaughter testified that he had obtained an itemization of collateral when he first came to the bank. The itemization introduced into evidence at trial was not obtained until January, 2009, after most of the loans had been renewed, and was sought, in part, for the purpose of shoring up the bank's files. During that interim period of nearly ten years,

15

Case 10-08093   Doc 27   Filed 07/25/11   Entered 07/25/11 14:35:01   Desc Main
              Document      Page 16 of 18

STATE BANK obtained no documentation substantiating the DEBTOR'S ownership interest in the antique business. Neither was an updated listing of the inventory regularly obtained, despite the revolving nature of such collateral. Nor was a third-party appraisal ever obtained, despite the obvious inherent uncertainties about the realizable value of antiques. While Slaughter testified that he was in the DEBTOR'S workshop on a regular basis, his interest focused upon the newly acquired items, and not upon the collective value of the inventory.

While the DEBTOR may have been a long-time customer, he was not a particularly good one, at least as of the beginning of 2008, when these loans had not yet been renewed. Slaughter was acutely aware that the DEBTOR was having chronic cash flow problems. A review of his monthly checking account statements reveals that he was suffering financial difficulties and was hardly in a position to be able to satisfy his indebtedness to the bank. Yet STATE BANK continued to renew the DEBTOR'S obligations despite his bleak financial condition. In point of fact, the cash flow evidenced by the checking account, which Slaughter had full access to, should have been viewed as a far more reliable indicator of the ongoing performance of the business than the additions or deletions to inventory that Slaughter observed in the DEBTOR'S shop.

STATE BANK suggests that as a small, local bank, it is not subject to the customary procedures undertaken by larger lending institutions, in evaluating credit-worthiness. Other courts have declined to create such an exception. *See In re Druckemiller*, 177 B.R. 859 (Bankr.N.D.Ohio 1994) (small town bank making loans on a "friendly basis" and relying on the honesty of its customers must accept the risky consequences of such strategy). As

the court noted in *In re Jairath*, 259 B.R. 308 (Bankr.N.D.Ill. 2001), the Seventh Circuit emphasized in *McClellan* that fraud must have an element of unfairness and the conduct of the debtor is only part of the picture. Slaughter's wealth of experience in banking is an important factor that cuts against STATE BANK'S argument that his reliance was justifiable. This Court finds that STATE BANK failed to exercise the minimal degree of care required of a reasonably cautious lender under the circumstances. Not having done so, it cannot claim to have been defrauded by the DEBTOR, for the true cause of its loss is attributed to its failure to conduct a commercially reasonable investigation. *See In re Bridges*, 51 B.R. 85 (Bankr.W.D.Ky. 1985).

What was established from the evidence is that the loans and renewals were made based upon the strength of the personal relationship between Slaughter and the DEBTOR. Slaughter was impressed with the DEBTOR'S restorative talents and reposed faith and confidence in his ability to weather the economic storm. Slaughter chose to rely on his assumptions about the antique business rather than make efforts at verification.

With respect to causation, no evidence was presented as to the value of any antiques owned by Ardelle. No evidence was presented as to what antiques that Slaughter observed in the DEBTOR'S shop were actually owned by Ardelle. STATE BANK'S position requires the Court to conclude, without evidence, that the loans would have been repaid had Slaughter's assumptions about the DEBTOR'S sole ownership been true. Without such evidence, the element of loss causation is not established.

Because STATE BANK failed to sustain its burden of proof, judgment will be entered for the DEBTOR. This Opinion constitutes this Court's findings of fact and

conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###